**NOT YET SCHEUDLED FOR ORAL ARGUMENT**

No. 23-5236

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

HUMAN RIGHTS DEFENSE CENTER,

Plaintiff–Appellant,

v.

UNITED STATES PARK POLICE,

Defendant–Appellee.

On Appeal from a Final Judgment of the United States
District Court for the District of the District of Columbia
Case No. 19-cv-1502 Hon. Tanya S. Chutkan

**BRIEF FOR APPELLANT**

Deborah M. Golden
D.C. Bar # 470-578
THE LAW OFFICE OF
    DEBORAH M. GOLDEN
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003
(202) 630-0332
dgolden@debgoldenlaw.com

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for Appellant*

Feb. 28, 2024

**CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES**

**Parties:** Appellant Human Rights Defense Center is a nonprofit organization. It has no parent corporation, and no publicly held corporation owns any portion of it. It was the Plaintiff in the District Court and is the Appellant here. The United States Park Police was the Defendant in the District Court and is the Appellee here. They are the only Parties to have appeared in the case, and both appear here.


**Rulings:** The District Court granted summary judgment for the Park Police on Aug. 23, 2023. *See* Doc. 31 (opinion), Doc. 32 (order).


**Related cases:** To the knowledge of Appellant's counsel, there are no cases related to this one for purposes of this disclosure.


/s/ Jim Davy

Jim Davy

# TABLE OF CONTENTS

**Page(s)**

Certificate as to Parties, Rulings, and Related Cases.............................. i

Table of Authorities................................................................................. iv

Introduction ............................................................................................. 1

Jurisdictional Statement ......................................................................... 2

Statutes and Regulations......................................................................... 3

Statement of Issues ................................................................................. 4

Statement of the Case ............................................................................. 4

Standard of Review ................................................................................. 11

Summary of Argument............................................................................. 11

Argument .................................................................................................. 14

I. The Park Police did not carry their burden to withhold the
names of individual officers, because the privacy interest is
*de minimis* and the Park Police offered no evidence that
officers would be harmed by release.................................................. 14

    A. The FOIA promotes release of records, and Exemption 6
contains the strongest presumption in favor of disclosure
in the Act..................................................................................... 15

    B. The privacy interest here is *de minimis*, and the
Government has not demonstrated that disclosure
would compromise whatever privacy interest exists—
which ends the inquiry............................................................... 19

    C. The public interest in disclosure is high. .................................. 24

    D. If balancing were nevertheless required, the existing
record requires release.............................................................. 27

    E. Regardless, the District Court erred because the
Government did not cite individualized reasons for
withholding different officers' names. ....................................... 34

II. The District Court invented a remedy for inadvertent release
that has no basis in the text of the FOIA and cannot flow
from the Court's implied powers......................................................... 36

# TABLE OF CONTENTS—continued

A. Disclosure under the FOIA and production pursuant to civil discovery rules are not comparable, and the difference forecloses the District Court's resort to so-called implied powers here...........................................37

B. Other district court decisions purporting to allow claw back are wrong, and in any event differ markedly from the facts here. ..............................................................46

Conclusion..............................................................52

Certificates..............................................................1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civil Liberties Union v. Dep't of Defense* (*ACLU v. DOD II*),
No. 09-cv-8071, 2012 WL 13075284 (S.D.N.Y. Mar. 20, 2012) ........... 47

*Am. Civil Liberties Union v. Dep't of Defense* (*ACLU v. DOD I*),
664 F.Supp.2d 72 (D.D.C. 2009) ................................................ 43, 44, 48

*Am. Civil Liberties Union v. United States Dep't of Justice*,
655 F.3d 1 (D.C. Cir. 2011) ................................................. 11, 16, 27, 28

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration
Review*,
830 F.3d 667 (D.C. Cir. 2016) ..................... 18, 20, 21, 25, 26, 29, 30, 35

*Armstrong v. Executive Ofc. of the President*,
97 F.3d 575 (D.C. Cir. 1996) .................................................. 20, 31, 34

*Bartko v. U.S. Dep't of Justice*,
898 F.3d 51 (D.C. Cir. 2018) ................................................... 17, 23, 27

*Bloomgarden v. U.S. Dep't of Justice*,
874 F.3d 757 (D.C. Cir. 2017) ................................................. 16, 29, 30

*Brock v. Pierce Cnty.*,
476 U.S. 253 (1986) ............................................................................ 25

*Chambers v. NASCO*,
501 U.S. 32 (1991) .............................................................................. 38

*Citizens for Responsibility & Ethics in Wash. v. United States Dep't of
Justice*,
45 F.4th 963 (D.C. Cir. 2022) ......................................................... 22, 23

*Citizens for Responsibility & Ethics in Wash. v. United States Dep't of
Justice* (*CREW II*),
58 F.4th 1255 (D.C. Cir. 2023) ........................................................... 40

*Cobell v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003) ...................................................... 38, 39

*Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of
Health & Human Servs.*,
554 F.3d 1046 (D.C. Cir. 2009) ........................................................... 25

*Cottone v. Reno*,
193 F.3d 550 (D.C. Cir. 1999) ............................................................. 40

Authorities upon which Appellant chiefly relies are marked with an
asterisk.

*Degen v. United States,*
517 U.S. 820 (1996) ............................................................. 39

*Dep't of Justice v. Reporters Comm. for Freedom of Press,*
489 U.S. 749 (1989) ............................................... 15, 28, 35

*Dep't of the Air Force v. Rose,*
425 U.S. 352 (1976) ............................................................. 15

*Ditlow v. Shultz,*
518 F.2d 116 (D.C. Cir. 1975) ........................................... 17

*EPA v. Mink,*
410 U.S. 73 (1973) ............................................................... 41

*Gallant v. NLRB,*
26 F.3d 168 (D.C. Cir. 1994) ............................................. 11

*Judicial Watch, Inc. v. Food Drug Admin. (Judicial Watch v. FDA),*
449 F.3d 141 (D.C. Cir. 2006) ...................................... 20, 22

*Judicial Watch, Inc. v. U.S. Secret Serv. (Judicial Watch),*
726 F.3d 208 (D.C. Cir. 2013) ...................................... 18, 22

*Kielty v. Fed. Emergency Mgmt. Agency,*
No. 14-CV-3269 (D.N.J. Dec. 8, 2014) .............................. 51

*King v. DOJ,*
830 F.2d 210 (D.C. Cir. 1987) ........................................... 22

*Krikorian v. Dep't of State,*
984 F.2d 461 (D.C. Cir. 1993) ........................................... 48

*Long v. United States I.R.S.,*
693 F.2d 907 (9th Cir. 1982) ............................................. 39

*Magassa v. Transp. Sec. Admin.,*
__ F.4th __, No. 22-5155 (D.C. Cir. Dec. 21, 2023) ............ 20

*Miller v. Casey,*
730 F.2d 773 (D.C. Cir. 1984) ........................................... 48

*Milner v. Dep't of the Navy,*
131 S.Ct. 1259 (2011) ......................................................... 15

*Miner v. Atlass,*
363 U.S. 641 (1960) ............................................................. 38

*Multi Ag Media LLC v. Department of Agriculture,*
515 F.3d 1224 (D.C. Cir. 2008) ............................... 16, 18, 25

*Nat'l Assoc. of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002) ...................................... 15, 16, 18, 21

*Nat'l Assoc. of Retired Fed. Employees v. Horner*,
879 F.2d 873 (D.C. Cir. 1989) ............................................... 21

*National Archives and Records Admin. v. Favish*,
541 U.S. 157 (2004) ........................................................ 17

*Niskanen Ctr. v. Fed. Energy Regulatory Comm'n*,
20 F.4th 787 (D.C. Cir. 2021) ...................................... 18, 21

*NLRB v. Sears, Roebuck Co.*,
421 U.S. 132 (1975) ........................................................ 41

*North v. Walsh*,
881 F.2d 1088 (D.C. Cir. 1989) ....................................... 41

*Prison Legal News v. Lappin*,
436 F.Supp.2d 17 (D.D.C. 2006) ...................................... 24

*Prison Legal News v. Samuels*,
787 F.3d 1142 (D.C. Cir. 2015) ..................... 1, 17, 18, 22, 24, 25, 26

*Public Citizen Health Research Group v. Food & Drug Administration*,
953 F.Supp. 400 (D.D.C. 1996) .................................... 47, 49, 50

*Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*,
415 U.S. 1 (1974) ........................................................... 39

*Reporters Comm. for Freedom of Press v. Fed. Bureau of Investigation*,
3 F.4th 350 (D.C. Cir. 2021) ............................................ 15

*Ripskis v. U.S. Dep't of Hous. & Urban Dev.*,
746 F.2d 1 (D.C. Cir. 1984) .............................................. 17

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) ......................................................... 49

*Shapiro v. Department of Justice*,
893 F.3d 796 (D.C. Cir. 2018) .......................................... 12

*Sierra Club v. United States Environmental Protection Agency*,
505 F.Supp.3d 982 (N.D. Cal. 2020) ..................... 39, 40, 43, 50, 51

*Smith v. Daily Mail*,
443 U.S. 97 (1979) ......................................................... 44

*Stern v. F.B.I.*,
737 F.2d 84 (D.C. Cir. 1984) .............................. 26, 31, 33, 34

*Stonehill v. I.R.S,
  558 F.3d 534 (D.C. Cir. 2009) ...................................... 39, 40, 41, 42, 43
The Florida Star v. B.J.F.,
  491 U.S. 524 (1989) ................................................ 44, 45, 50
United States Dep't of Defense v. Federal Labor Relations Auth.,
  510 U.S. 487 (1994) ................................................ 16, 17, 21
Vaughn v. Rosen,
  484 F.2d 820 (D.C. Cir. 1973) ............................................ 23
Washington Post Co. v. United States Department of Health & Human
  Services,
  690 F.2d 252 (D.C. Cir. 1982) ............................................ 17, 41, 42, 51
Wilson Cowan v. Fed. Commc'n Comm'n,
  21-cv-895-RMM, 2022 WL 4245485 (D.D.C. Sep. 15, 2022) ......... 48, 49
Wolf v. C.I.A.,
  473 F.3d 370 (D.C. Cir. 2007) ...................................... 20, 48

**Statutes**
28 U.S.C. § 1331 ............................................................... 3
28 U.S.C. § 1291 ............................................................... 3
5 U.S.C. § 552 ............................................................... 37
5 U.S.C. § 552(a)(4)(B) ....................................................... 12
5 U.S.C. § 552(b)(4) .......................................................... 42
5 U.S.C. § 552(b)(5) .......................................................... 42
5 U.S.C. § 552(b)(6) .......................................................... 16, 18
5 U.S.C. § 552(b)(7)(C) ....................................................... 16

**Other Authorities**
ABA Model Rule 4.4(b) ......................................................... 42

**Rules**
Fed. R. Civ. P. 26(b)(5) ...................................................... 42

# INTRODUCTION

Appellant the Human Rights Defense Center ("HRDC"), in its current form and under its previous name Prison Legal News, has spent more than thirty years advocating for incarcerated people. As part of that work, it uses the FOIA to obtain information about federal tort claims made by people alleging misconduct and abuse on the part of federal law enforcement officers and other officials. HRDC uses information about misconduct by federal officers and resulting settlements to help inform people engaged in litigation over similar misconduct, to help identify patterns of misconduct and abuse, and to advocate for reforms and other changes. Agencies do not give this information up gladly; HRDC has frequently had to litigate to obtain the information it requests, including before this Court. *E.g. Prison Legal News v. Samuels*, 787 F.3d 1142 (D.C. Cir. 2015).

When HRDC asked the Park Police for information related to federal tort claims it had settled, it similarly had to sue. Even then, the Park Police refused to give HRDC the names of individual officers whose misconduct had given rise to settled federal tort claims—despite offering, as the District Court noted, no reason to suspect that release would impair any officer's privacy interest. The District Court erred by agreeing with the Park Police anyway, because the failure to connect potential release with any concrete harm bars invoking Exemption 6. And in any event, this Court's precedents make clear that individual officer names

can provide additional value into the working of the government that outweighs privacy interests even when an agency properly supports potential harm from release.

Beyond the officer names, however, the District Court made a second, independent error. During the course of the litigation, the Park Police inadvertently disclosed the names of two federal tort claimants. When it realized it had done so, it demanded a claw back remedy. No such remedy exists under the FOIA. The District Court erred by ordering it anyway. As this Court has explained, the FOIA differs substantially from civil discovery, where a court's implied powers to manage its own litigation might allow such an order. But while the Government has numerous tools to safeguard information from accidental release, once it makes information public, First Amendment considerations and the nature of the FOIA do not allow claw back—at least absent special circumstances, like national security, not present here. And where, as here, the Government's own litigation conduct has placed and left one claimant's name on the public docket of the District Court, its invocation of hypothetical harm to the claimants' interests to justify its claw back request rings particularly hollow. This Court should reverse.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to hear this FOIA case under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. This Court has appellate

jurisdiction from a final order granting summary judgment under 28 U.S.C. § 1291. The District Court entered its final order granting summary judgment on August 29, 2023. Doc. 32. This appeal is timely because Appellant filed the notice of appeal on October 16, 2023. Doc. 33.

## STATUTES AND REGULATIONS

### 5 U.S.C. § 552 (The Freedom of Information Act)

§ 552(b)(4) – This section does not apply to matters that are: trade secrets and commercial or financial information obtained from a person and privileged or confidential;

§ 552(b)(5) – This section does not apply to matters that are: inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

§ 552(b)(6) – This section does not apply to matters that are: personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

§ 552(b)(7)(c) – This section does not apply to matters that are: records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or

information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.

## STATEMENT OF ISSUES

1. Did the District Court err by holding that the Park Police could withhold the names of officers whose excessive force gave rise to federal tort claims the Park Police settled, where the Park Police failed to assert any non-speculative or concrete threat that disclosure would pose to those officers' privacy interests, where the officers have only a *de minimis* interest in the disclosure of their bare names that may already be in public legal proceedings, and where the public has a substantial interest in law enforcement misconduct that bears upon the public fisc?

2. Did the District Court err by allowing the Park Police to claw back the names of tort claimants it inadvertently disclosed to the HRDC, where the FOIA includes no such authority and the Court avowedly resorted to its own implied powers, despite such claw back having no bearing upon the Court's management of its docket, courtroom, or the proceedings?

## STATEMENT OF THE CASE

Appellant HRDC regularly submits FOIA requests to federal law enforcement agencies seeking information about settled tort claims. Doc. 24 at 2. Appellee the United States Park Police is a quintessential law

enforcement agency: it has jurisdiction in all federal parks, and concurrent arrest authority across five states—including Maryland and Virginia—and the District of Columbia. Doc. 31 at 1. And its officers, like other law enforcement officers, have authority to use force against civilians. Information about settled federal tort claims helps inform other litigants, taxpayers, and anyone interested in patterns of misconduct and abuse by government actors. Doc. 31 at 1; Doc. 1 at 2-3; Doc. 24-2 at 2. So HRDC submitted a FOIA request for, in relevant part, "records . . . for all claims or lawsuits brought against the U.S. Park Police and/or any of its agents or employees in which payments totaling $1,000 or more were disbursed from January 1, 2010 to the present." Doc. 31 at 2; Doc. 1 at 4. The request specifically asked for seven subclasses of information, including, as relevant to this appeal, "the name of all parties involved." *Id.*

Initially, the Park Police did not respond at all. So HRDC filed suit in federal district court. Doc. 31 at 2; Doc. 1 at 4. Pursuant to negotiation after the Park Police filed an answer, HRDC narrowed its FOIA request in various ways—including by giving up access to any records of auto accidents or records pertaining to workplace discrimination or wage and hour claims, and by increasing the monetary threshold from $1,000 to $3,000. Doc. 31 at 3. In return, the Park Police disclosed some responsive records, albeit with redactions of, as relevant here, the names of both the claimants and the individual officers involved. Doc. 31 at 3. After that

disclosure, the Park Police also informed HRDC that it had "inadvertently released" the names of two claimants, and asked HRDC to destroy those documents. Doc. 31 at 3. The Parties disagreed strenuously over both the redactions and the proper response to the inadvertent disclosure, and those two disagreements are the heart of this appeal.

Ultimately, the Parties cross-moved for summary judgment as to the propriety of the redactions of the names of officers whose conduct gave rise to settled tort claims, and as to the Park Police's demand to claw back its inadvertent disclosures. Doc. 31 at 3.[1] At issue for the purposes of disputed redactions are the names of officers involved in three settled tort claims:

The first is a sergeant of the Park Police. Doc. 23-8 at 13. The Park Police settled for $17,500 a federal tort claim that this officer engaged in excessive force by assaulting a visitor to the Lincoln Memorial. The Park Police refused to release the officer's name, justifying that based upon Exemption 6 and the officer's personal privacy. Doc. 23-8 at 14. The Park Police asserted that "the rank of the officer involved sufficiently satisfies the public's interest in knowing more about the case," and cited the

_____

[1] The Parties also cross-moved for summary judgment as to the propriety of the Park Police redacting the names of the claimants. Other than insofar as they bear upon the issue of the inadvertently disclosed names, those redactions are not at issue in this appeal.

"relatively low-rank[]" to explain its view that release would lead to "a de minimus public benefit." It also asserted that the allegations had never been proven, *id.*, although an Internal Affairs Unit investigation sustained a finding against the officer. Doc. 24-1. It did not explicitly mention whether the sergeant remains employed with the Park Police. *See generally* Doc. 23-8 at 15.

The second is a Park Police detective involved in the forcible entry into a residence by a SWAT team. Doc. 31 at 4. That forcible entry gave rise to a federal tort claim alleging excessive force on the part of an officer that settled for $13,500. In refusing to release the name of the detective involved, the Park Police used similar language as it used with the sergeant involved in the Lincoln Memorial assault, saying that it withheld the name because of personal privacy, believing that knowing "the rank of the officer involved sufficiently satisfies the public's interest in knowing more about the case," although here explicitly noting that the detective remained employed by the Park Police. Doc. 23-8 at 15. It also identically asserted that the name would offer only a "de minimus public benefit."

The third is a Park Police detective who unlawfully detained a member of the public at a meeting of the D.C. Taxicab Commission, which resulted in a $15,000 settlement. Doc. 31 at 4. In refusing to release the name of the detective involved, the Park Police used identical language as with the sergeant involved in the Lincoln Memorial assault and the detective

involved in the forcible entry, saying that it withheld the name because of personal privacy, asserting again that knowing "the rank of the officer involved sufficiently satisfies the public's interest in knowing more about the case." Doc. 23-8 at 15. As with the detective involved in the raid, the Park Police specifically noted that the detective remained employed by the Park Police. Doc. 23-8 at 15. And as with both other redactions, it asserted that the name would offer only a "de minimus public benefit." *Id*. Because of how the Park Police described the officers involved in its *Vaughn* Index, it is unclear whether the detective involved in the forcible entry incident is the same detective involved in the Taxicab Commission incident—the two descriptions have no distinguishing particulars.

At issue for the Park Police's request for claw back were two inadvertent disclosures of the names of two claimants:

The first is the name of a claimant who made a discrimination claim against the Park Police. Doc. 24 at 8.

The second is the name of the claimant in the previously-described assault by a Park Police sergeant at the Lincoln Memorial. Doc. 24 at 8. Notably, however, the name of that claimant remains on the public docket of the case in the District Court as of this filing—because besides inadvertently disclosing the name to HRDC in the course of disclosing responsive records, the Park Police put the name of the claimant into the record of the FOIA litigation itself by including it in the relevant entry of its *Vaughn* Index. *See* Doc. 23-8 at 13 (listing the last name of the

claimant). HRDC nevertheless agreed not to disseminate the name during the pendency of this litigation. Doc. 24-2.

In its summary judgment filing, the Park Police submitted the Declaration of Janeen Tyler, a FOIA officer with the Park Police. Ms. Tyler discussed the request and the resulting search for records, and she justified the redaction of officers' names based upon FOIA Exemption 6 and her sense that releasing those names "would constitute an unwarranted invasion of privacy." Doc. 23-3 at 4. She explained that the Park Police also undertook a second review of the redactions and reached the same result, because of "the significant privacy interest in [officers'] identities" that "outweighed the release of the information," as well as her conclusion that the names "would not shed light on the activities of USPP." Doc. 23-3 at 6. At no point did Ms. Tyler assert any possible harm—speculative or otherwise—that would befall the officers if their names were released to the public. *See generally* Doc. 23-3. She similarly did not assert any possible harm—speculative or otherwise—that would befall the claimants whose names the Park Police had inadvertently disclosed, if the District Court did not order claw back.

In resolving the cross-motions, the District Court granted summary judgment for the Park Police. In ordering that the Park Police had lawfully redacted the officers' names, the District Court noted that courts "have generally found that government employees and officials, especially law enforcement personnel, have a privacy interest in

protecting their identities that outweighs the public interest" because of the possible embarrassment and harassment that might come their way as a result of disclosure. Doc. 31 at 7. The Court acknowledged that it had had to *sua sponte* supply the possible connection of that potential harm to release, because the "Park Police . . . [did] not explain how these potential threats to privacy are more palpable than mere possibilities." Doc. 31 at 9. Indeed, the Court distinguished the Park Police's submission from precedents of this Court, noting that the "Park Police does not identify any harm or violence the officers will face as a result of disclosure." Doc. 31 at 9. Instead, the Court observed of its own volition that "disclosing their names may lead the public to infer that the officers engaged in wrongdoing, which could result in retaliation, embarrassment, harassment, and undue public attention." *Id*. In discussing the potential benefit to the public of release, it treated the fact that the officers were still employed by the Park Police as a reason *not* to order disclosure of the officers' names. Doc. 31 at 10-11. The District Court weighed the possible harm it had supplied itself against its assessment of the public interest in knowing the officers' names, and then denied disclosure.

As to claw back, the District Court undertook two paragraphs of analysis before ordering that the Park Police could claw back the inadvertently disclosed names. The Court held that "FOIA does not provide for the compelled return or destruction of inadvertently produced

documents." Doc. 31 at 11 (citing 5 U.S.C. § 552). But it also held that in resort to "certain implied powers" by which courts "manage their own affairs so as to achieve the orderly and expeditious disposition of cases," it could "bar dissemination of information inadvertently disclosed in FOIA proceedings." Doc. 31 at 11, 12.

This appeal followed.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo. *Am. Civil Liberties Union v. United States Dep't of Justice* ("*ACLU*"), 655 F.3d 1, 5 (D.C. Cir. 2011). For FOIA cases, this means "ascertain[ing] whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under the FOIA." *Id.* (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994); *see also* 5 U.S.C. § 552(a)(4)(B). An agency has not carried its burden when it offers only conclusory affidavits, among other circumstances. *Shapiro v. Dep't of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018).

## SUMMARY OF ARGUMENT

The District Court erred here on two different issues. First, the District Court erred by ordering that the Park Police could withhold the names of three different officers whose actions gave rise to federal tort

claims settled by the Park Police. The District Court should have ordered release because the Park Police failed to offer any evidence—or even speculation—that release of officers' names would lead to any foreseeable harm to their privacy interests. It should also have ordered release because the Park Police did not carry its burden to show that bare names of officers amounted to a more than *de minimis* privacy interest. And even if neither of those things were true, the District Court should have ordered release because the substantial public interest in law enforcement misconduct—especially misconduct that gives rise to tens of thousands of dollars of settlements paid for by public dollars—more than outweighs the limited privacy interest at stake and the merely speculative harm to that interest that disclosure might cause. In any event, the District Court erred by treating the officers as a monolith, despite differences in rank, type of misconduct, and potentially ongoing employment status and misconduct history.

Second, the District Court erred by granting the Government's demand to claw back responsive information that it inadvertently disclosed. The FOIA does not contain a claw back provision, as the District Court acknowledged. And the "implied powers" to which the District Court resorted instead do not support claw back in the FOIA context. Implied powers to manage litigation and associated discovery have no application to the FOIA because of the numerous differences between FOIA disclosure and civil discovery production, as this Court

has explained. Those differences are especially stark in the context of FOIA Exemption 6, which unlike other FOIA exemptions does not incorporate privileges that apply in discovery. The non-binding district court decisions that the District Court cited to support its claw back order are both wrong and—like the District Court—overlook serious First Amendment issues with claw back of documents once disclosed, even inadvertently, to the public. And even if they were correct on their own facts, important distinctions preclude application to support claw back in this case.

This Court should reverse.

# ARGUMENT

**I.  The Park Police did not carry their burden to withhold the names of individual officers, because the privacy interest is *de minimis* and the Park Police offered no evidence that officers would be harmed by release.**

The District Court erred in granting summary judgment to the Government and denying disclosure for two key reasons. First, the Court fabricated a potential harm from disclosure that the Government did not put anywhere in the summary judgment record—and a speculative one at that. Because the Government did not include any statements about potential harm to the privacy of officers whose uses of excessive force gave rise to settled federal tort claims in the declaration and other evidence it submitted, under this Court's precedents, the District Court need not have conducted a FOIA balancing at all—it should simply have ordered release. But second, regardless, even if the Court properly conducted a balancing, it still erred by resolving that balancing analysis in favor of the Government. It weighed the fabricated harm too heavily, and it minimized the strong public interest in the disclosure of the identities of federal officers who use excessive force. And regardless of how it conducted the balancing, the District Court did not undertake different analyses into release as to the different officers despite numerous factual distinctions between the incidents giving rise to Appellant's request.

**A.    The FOIA promotes release of records, and Exemption 6 contains the strongest presumption in favor of disclosure in the Act.**

The FOIA exists "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). It advances "the citizens' right to be informed about what their government is up to." *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989). It contains nine exemptions that the Government can invoke to withhold release of records, but courts must construe those exemptions narrowly—because "FOIA mandates a strong presumption in favor of disclosure." *Nat'l Assoc. of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002). The Supreme Court has repeatedly affirmed the Act's goal of disclosure and the requirement that courts construe the exemptions narrowly. *E.g. Milner v. Dep't of the Navy*, 131 S.Ct. 1259, 1265 (2011).

FOIA accomplishes its goal of promoting disclosure and limiting the application of exemptions in part by imposing multiple burdens of proof on the Government. For one thing, the Government must meet the so-called foreseeable harm requirement, added to the FOIA in 2016, which "imposes an independent and meaningful burden on agencies." *Reporters Comm. for Freedom of Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021). That burden requires the Government to demonstrate the "basis and likelihood" of any purported harms that

might come from release. *Id*. Separately, the Government must also carry the burden of proving the applicability of one or more individual exemptions to justify withholding—and that burden varies by exemption and context, though it is generally high. *Id*. at 361 (citation omitted).

At issue here is FOIA's Exemption 6. This exemption allows the Government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 is the most requester-friendly of any of the nine exemptions in the FOIA; this Court has long and repeatedly observed that "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Multi Ag Media LLC v. Department of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (quoting *Norton*, 309 F.3d at 32); *see also*, *e.g.* *Bloomgarden v. U.S. Dep't of Justice*, 874 F.3d 757, 760 (D.C. Cir. 2017) (same). Exemption 6 stands in stark contrast to other exemptions for textual and contextual reasons. Notably, unlike Exemption 7(C), which "permits withholding of such records if disclosure would constitute an 'unwarranted' invasion of personal privacy," Exemption 6 "requires a '*clearly* unwarranted' invasion to justify nondisclosure." *ACLU*, 655 F.3d at 6 (emphasis in original) (quoting *United States Dep't of Defense v. Federal Labor Relations Auth.* ("*FLRA*"), 510 U.S. 487, 496 n.6 (1994)); *compare* 5 U.S.C. § 552(b)(6) *with* 5 U.S.C. § 552(b)(7)(C). Because "[t]he adverb 'clearly,' found in Exemption 6, is not used in Exemption 7(C)," it

gives Exemption 7(C) a "comparative breadth" to justify withholding absent in the narrower Exemption 6, a difference that "is no mere accident in drafting." *National Archives and Records Admin. v. Favish*, 541 U.S. 157, 165-66 (2004). "Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs us to 'tilt the balance [of public interest in disclosure against privacy interests] in favor of disclosure.'" *Washington Post Co. v. United States Department of Health & Human Services*, 690 F.2d 252, 261 (D.C. Cir. 1982) (quoting *Ditlow v. Shultz*, 518 F.2d 116, 169 (D.C. Cir. 1975)).

Besides the higher standard for how unwarranted the invasion must be, Exemption 6 also only "applies to any disclosure that 'could reasonably be expected to constitute' an invasion of privacy," while Exemption 7(C) "bars any disclosure that 'would constitute' an invasion of privacy." *FLRA*, 510 U.S. at 497 n.6. In light of these multiple textual differences, "Exemption 6 requires an even stronger demonstration of a privacy interest than Exemption 7(C)." *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 67 (D.C. Cir. 2018). The Government may meet its "burden of showing that a substantial invasion of privacy will occur if the documents are released" by affidavits, but only if those affidavits "contain reasonable specificity of detail rather than merely conclusory statements." *Samuels*, 787 F.3d at 1148 (citing *Ripskis v. U.S. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984) and *Judicial Watch,*

*Inc. v. U.S. Secret Serv.* ("*Judicial Watch*"), 726 F.3d 208, 215 (D.C. Cir. 2013)).

In assessing Government invocations of Exemption 6, the Court uses a "two-step process." *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review* ("*AILA*"), 830 F.3d 667, 673 (D.C. Cir. 2016); *Multi Ag Media*, 515 F.3d at 1228. At the first step, courts consider whether the records in question fall within the category. *Id.* Here, the parties agree that the names of officers fall within the category of records covered by Exemption 6.

At the second step, courts consider whether disclosure would constitute the aforementioned "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). That analysis has several components. For one thing, "a court must first determine whether disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Niskanen Ctr. v. Fed. Energy Regulatory Comm'n*, 20 F.4th 787, 790 (D.C. Cir. 2021); *see also Samuels*, 787 F.3d at 1147 (D.C. Cir. 2015). If disclosure would not compromise a substantial privacy interest, that ends the inquiry, and the Government cannot withhold the records. *Id.* If the privacy interest at stake is substantial, *and* release would compromise that interest, the court "must balance the individual's right of privacy against the public interest in disclosure." *Samuels*, 787 F.3d at 1147; *Niskanen Ctr.*, 20 F.4th at 790-91; *see also Norton*, 309 F.3d at 32 (noting that the analysis "requires the court to balance the individual's

right of privacy against the basic policy of opening agency action to the light of public scrutiny").

**B. The privacy interest here is *de minimis*, and the Government has not demonstrated that disclosure would compromise whatever privacy interest exists— which ends the inquiry.**

Here, even acknowledging that the names of officers who have participated in alleged incidents of excessive force fall within the category protected by Exemption 6, the Government failed to show that the officers had more than a *de minimis* privacy interest at stake, and similarly failed to show that disclosure would compromise whatever privacy interest they did have. Either one of those failures would bar the Government's recourse to Exemption 6, without a court even needing to conduct an Exemption 6 balancing analysis. As to the former failure, this Court's cases about individual names demonstrate that bare names— unconnected to addresses or any other personal information of any kind—do not entail a more than *de minimis* privacy interest for individuals. As to the latter failure, the Government did not offer any evidence—speculative, conclusory, or otherwise—about the harm to a privacy interest that would follow from disclosure, leaving the District Court to fabricate a connection between a hypotherical harm and release of the names to fill in that gap. Either one of these failures requires reversal and release.

First, the Government failed to show a more than *de minimis* privacy interest in the bare names of individual officers. Bare names are not categorically exempt. *Judicial Watch, Inc. v. Food Drug Admin.* ("*Judicial Watch v. FDA*"), 449 F.3d 141, 153 (D.C. Cir. 2006); *AILA*, 830 F.3d at 670 (rejecting categorical invocation of Exemption 6 for bare names of immigration judges). Instead, "[t]he scope of a privacy interest under Exemption 6 will always be dependent on the context in which it has been asserted." *Armstrong v. Executive Ofc. of the President*, 97 F.3d 575, 581-82 (D.C. Cir. 1996). This Court has previously identified and discussed factors bearing upon specific context of releasing individual names of government officials. For example, it has noted that some officials' "sensitive positions might subject them to a heightened risk of harassment or harm." *Magassa v. Transp. Sec. Admin.*, __ F.4th __, No. 22-5155, at *3 (D.C. Cir. Dec. 21, 2023). It has considered the role that government officials play in national security, because the national security context can pose heightened risks from disclosure. *Wolf v. C.I.A.*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). But in general, it has almost always discussed the effect of combining names with other types of information when finding a more than *de minimis* privacy interest for individuals.

Even some precedents that point to a more than *de minimis* privacy interest in just "names and addresses" reflect this. This Court has often discussed the privacy interests at stake in the possible release of names

plus addresses. *See, e.g.*, *Norton*, 309 F.3d at 35 (discussing "the privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address"). But it has explained that particular concerns apply to the possible release of addresses, including, for example, "[t]he risk of unwanted contact or solicitation," *Niskanen Ctr.*, 20 F.4th at 792, or the risk that disclosure "could interfere with the subjects' reasonable expectations of undisturbed enjoyment in the solicitude and seclusion of their own homes." *Norton*, 309 F.3d at 35; *Nat'l Assoc. of Retired Fed. Employees v. Horner*, 879 F.2d 873, 876 (D.C. Cir. 1989) (same). And the Supreme Court has linked the potential release of addresses to foreseeable harms that release of only names does not cause, noting in one FOIA case that "the privacy of the home . . . is accorded special consideration in our Constitution, laws, and traditions." *FLRA*, 510 U.S. at 510; *see also id.* at 497 (discussing "the privacy interest of bargaining unit employees in nondisclosure of their addresses"). Here, no such interests apply to the possible release of bare names, and nothing in the record submitted by the Park Police justifies treating bare names as more than a *de minimis* interest. This, on its own, should compel release.

Second, and regardless, the Government failed to connect the potential release of the officers' names to the privacy interest at stake. To do that, the Government must assert more than just that individual officials "have a privacy interest in withholding their names." *AILA*, 830 F.3d at 674. Instead, to show that connection, the Government must offer

affidavits that "contain reasonable specificity of detail rather than merely conclusory statements." *Judicial Watch*, 726 F.3d at 215. Similarly, declarations or affidavits must provide more than "a general rationale for protecting personal identifying information," exceeding a boilerplate note that "association with the filing of a claim can be stigmatizing." *Samuels*, 787 F.3d at 1148. In the past, this Court has credited an asserted link between potential release of names to a sufficiently concrete harm where the Government has pointed to recent past violence of the same type about which it warns, and to open advocacy for violence against similarly-situated people. *Judicial Watch v. FDA*, 449 F.3d at 153 (addressing potential release of government employees who approved abortion drug in light of "evidence of abortion clinic bombings" and "websites that encourage readers to . . . kill or kidnap employees" of the drug manufacturer).

In requiring the Government to set out the connection between the potential release and some concrete, non-speculative harm that might come from it, this Court has emphasized that the Government must make a specific showing to carry its burden. "The significance of agency affidavits in a FOIA case cannot be underestimated." *Citizens for Responsibility & Ethics in Wash. v. United States Dep't of Justice* ("*CREW*"), 45 F.4th 963, 977 (D.C. Cir. 2022) (quoting *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987)). Affidavits must contain specificity, because a "requester's lack of knowledge seriously distorts the traditional

adversary nature of our legal system's form of dispute resolution." *CREW*, 45 F.4th at 977 (quoting *Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973)). Specificity helps somewhat correct that asymmetry of information, even where a requester cannot see the underlying records. *Id*. Where the Government "ignores altogether its obligation to specifically identify the privacy interest at stake, which can vary based on many factors, including frequency, nature, and severity of the allegations," *Bartko*, 898 F.3d at 66, much less to connect that interest to some harm, it has not made the required showing.

Here, the District Court erred because the Park Police submitted a declaration and statements in its *Vaughn* Index of exactly the sort that this Court rejected in *AILA*, *Samuels*, and *CREW*. In the *Vaughn* Index explaining why it felt that it could withhold the officers' names, the Park Police included boilerplate recitations about the privacy interest of the officers, and it copied-and-pasted statements about the sufficiency of disclosing the ranks of the officers. *See* Doc. 23-8 at 14, 15, 16. Indeed, much of the language appeared to be copied-and-pasted regardless of the different factual contexts of the three claims. And in the declaration that the Park Police submitted with its motion for summary judgment, Ms. Tyler simply stated her legal conclusion that release would constitute an unwarranted invasion of privacy without offering any evidence at all about the harms that might befall the officers if their names were disclosed. *See generally* Doc. 23-3. She certainly did not offer the level of

detail about potential harms—and the required causal link between disclosure and those harms—that this Court credited in *Judicial Watch v. FDA*. If anything, HRDC's own prior experience as a requester confirms that the opposite is true. Where this Court has previously ordered release of exactly this sort of information in the face of a similar request to a different agency, *Samuels*, 787 F.3d at 1142, no harm befell any of the individuals involved in that release of records. Under the circumstances, this Court could (and should) reverse solely on this basis.

## C.    The public interest in disclosure is high.

If this Court does nevertheless review the District Court's balancing and conduct it *de novo*, Appellant emphasizes the substantial public interest on the disclosure side of the balance. The public has a significant interest in knowing about both misconduct on the part of federal law enforcement officers and the effect that such misconduct has on how the Government spends tax dollars. This Court has previously noted the high public interest value of claims about incidents of misconduct by federal law enforcement officers. "[D]ocuments regarding specific incidents that occurred" and gave rise to federal tort claims "will provide insight to the public about how its federal [parks] are being managed and operated, and how its tax dollars are being expended." *Samuels*, 787 F.3d at 1151 (quoting *Prison Legal News v. Lappin*, 436 F.Supp.2d 17, 26 (D.D.C. 2006)). Continuing to pay individual officers whose acts expose the

Government to civil liability also goes to possible "misuse of public funds, an interest typically favoring disclosure." *Samuels*, 787 F.3d at 1151 (citing *Multi Ag Media*, 515 F.3d at 1232-33). "[T]he protection of the public fisc is a matter that is of interest to every citizen." *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 (1986).

Names matter particularly for the public interest here, beyond a prudent taxpayer's interest in the amount of the settlements, however. This Court has previously considered whether the Government has offered other information that might serve the public interest at stake, and thus whether the public has an interest in the "incremental" addition of a name itself. *AILA*, 830 F.3d at 674; *see also id.* at 672 (noting that the Government offered "a unique three-digit code" for each judge so that the requester could fulfill the stated goal of "connect[ing] complaints to a particular judge and to identify patterns"). And the public may in fact often have a substantial interest in individual names themselves. Unredacted individual names might allow Appellant to connect individual officers to patterns of misconduct, and "[i]dentifying employees who repeatedly engage in tortious or discriminatory conduct will shed light on an agency's performance of its statutory duties." *Samuels*, 787 F.3d at 1151 (cleaned up) (citing *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1051 (D.C. Cir. 2009)). Individual names also promote accountability because they would allow Appellant or others to ascertain

whether the Park Police imposed any discipline in connection to the incidents. That, "in turn, will further the public interest in ensuring that disciplinary measures imposed are adequate, and that those who are accountable are dealt with in an appropriate manner." *Samuels*, 787 F.3d at 1151 (quoting *Stern v. F.B.I.*, 737 F.2d 84, 92 (D.C. Cir. 1984)).

Here, the facts in the record demonstrate the significant and ongoing public interest. For one thing, the detective or detectives involved in the second and third incidents is or are still employed by the Park Police, and so they continue to have opportunities to engage with the public. *See* Doc. 23-8 at 15, 16.[2] Indeed, the District Court erred here in part because it treated ongoing employment with the Park Police as a reason *not* to order disclosure, *see* Doc. 31 at 11, even though this Court has explained that the public has a greater interest in the names of officials still employed by the Government. *AILA*, 830 F.3d at 675. Beyond that, these officers have already cost the public tens of thousands of dollars in settlements, bearing directly upon the public fisc. At least one of them had the allegations substantiated by an internal affairs investigation. Doc. 24-1. And without the names, HRDC (or anyone else) lacks the ability to connect the officers to the patterns of misconduct. This includes patterns

---

[2] The sergeant could still be employed as well—the Park Police did not explicitly address the sergeant's employment status, *see* Doc. 23-8 at 14, and at summary judgment, the Court could construe that the officer remains employed for purposes of heightening the public interest for the balancing.

within the Park Police, including in incidents not documented in this release, or even within this limited group of three incidents if the second and third involve the same detective. But it also includes patterns of misconduct on the part of those individual officers across jurisdictions that the public has a significant interest in knowing—all the more important in a place like Washington, D.C., where numerous federal and local law enforcement agencies with concurrent jurisdiction employ tens of thousands of officers who can easily shift departments. Simply put, the public interest in disclosure here is substantial.

### D. If balancing were nevertheless required, the existing record requires release.

In undertaking the balancing analysis in the past, this Court has observed that greater public interest in disclosure can overcome a more substantial privacy interest, and that even a lesser public interest can still support release in the face of an insubstantial privacy interest. For instance, "an unsubstantiated allegation that was dismissed as frivolous might implicate a greater privacy interest or a reduced public interest" in the balancing analysis. *Bartko*, 898 F.3d at 66-67; *see also ACLU*, 655 F.3d at 7 (holding that a convicted defendant's privacy interest "is weaker than [that of] individuals who have been acquitted or whose cases have been dismissed"). These settled claims are definitionally non-frivolous. But the Court has also identified a number of different factors that bear

upon the balancing analysis, and all counsel release when applied to the facts of this case.

First, in balancing privacy interests against public interest in disclosure, the Court has addressed (and ordered) the release of names that might link those same names back to already-public information. A list of names "alone contains little that is personal," as noted in distinguishing names from names plus addresses. *ACLU*, 655 F.3d at 8. But even to the extent that names could link back to "underlying proceedings" in a court that necessarily contain far more information, disclosures that allowed someone to find those underlying dockets "would disclose only information that has already been the subject of a public proceeding." *Id*. The Court in *ACLU* distinguished between criminal prosecutions that ended in trials or guilty pleas with those arrests "that may not have taken place in public," citing *Reporters Comm.*, 489 U.S. at 754 n.2 to further underscore the greater privacy interest that applies to pre-proceeding criminal justice records. *ACLU*, 655 F.3d at 8. Notably, that analysis also undertook the balancing under the higher standard of Exemption 7(C) rather than the more requester-friendly Exemption 6, as here. Where, as here, the disclosure of the names of the officers comes in the context of settlements of filed tort claims, and the disclosure of the names of the officers involved would merely allow someone to link those names back to at least one already-public docket, *ACLU* counsels

release—particularly given the lower standard of Exemption 6 that applies here.

Second, this Court has also described the particular interest in disclosing individual name—even beyond a unique but anonymized identifier—of a Government employee who retains their job. In discussing contextual factors that justified rejecting a categorical withholding of the names of immigration judges, this Court explained that "[a] retired immigration judge—who, after all, is a private citizen—presumably would have a greater privacy interest in avoiding disclosure of her name than would an immigration judge who sits on the bench today." *AILA*, 830 F.3d at 675. Given the purpose of the FOIA to bring transparency to the acts and functions of the Government, "the public interest likely would be more pronounced in the case of a sitting immigration judge, who continues to make decisions as an employee of the Department of Justice." *Id.* at 675-76. This Court has also discussed this in the context of staleness of requested information, noting a reduced public interest where the information at issue involves conduct "over twenty years old." *Bloomgarden*, 874 F.3d at 760 (emphasizing that "there is no expiration date on the subject of the FOIA requests" but noting that older information "does not necessarily reveal anything of present personnel policies"). Where, as here, the events in question are recent and the Government's own submission reveals that the officers in

question continue to have jobs—and opportunities to interact with the public—at the Park Police, this cuts in favor of disclosure.

Third, the balance tips further in favor of disclosure given the possibility that revealing a name might give rise to public knowledge of patterns of misconduct. An individual name of an officer "subject to numerous and/or serious substantiated complaints might shed considerable light on matters of public interest, whereas disclosing the name of an [official] subject to a single, unsubstantiated complaint might not." *Id.* at 767. Appellant takes no position on the relative importance to the public of a potential pattern of disrespectful conduct toward litigants in immigration proceedings versus a potential pattern of excessive force on the part of a federal law enforcement officer—all misconduct by public officials falls within the heartland of the FOIA. But Appellant would note that Park Police officers are authorized to use deadly force against the public, and to make arrests in the District of Columbia, Virginia, and Maryland, among other places. Doc. 31 at 1. And especially given how frequently officers move between departments, the name of an officer with at least one known serious incidence of excessive force could help "the public to make such connections" with other possible incidents of excessive force. *AILA*, 830 F.3d at 676. This matters particularly where, as here, despite having the burden both as the movant at summary judgment *and* the burden to proving the applicability of Exemption 6, the Government has pointedly offered no evidence that the incidents of force

at issue in the settled cases were these officers' *only* incidents of excessive force. Under the circumstances, the Court should construe the facts in favor of HRDC and presume a pattern, which cuts in favor of release.

Fourth, there is no national security interest or concrete threat to the personal safety of federal agents in another country at stake. Where the disclosure of a record might reveal details about "counter-intelligence operations in a hostile country," and relatedly, where disclosure of a record might "provide information to the target country and put the agents in danger" in the context of that particular national security operation, the balancing analysis understandably counsels against disclosure. *Armstrong*, 97 F.3d at 582. But the *Armstrong* Court specifically contrasted that fact pattern with a hypothetical in which the same agents discuss a non-national security topic ("recreational activities for the White House staff") at a domestic location that poses less risk of danger ("the White House"), suggesting that on those altered facts "there is at most a minimal privacy interest involved" and that the requester could get disclosure. *Id*. Where, as here, the names of the officers in question have no national security implications at all, this factor cuts in favor of release.

Finally, this Court has also previously undertaken an analogous balancing as to the names of even "lower-level" employees at the FBI, in a way that underscores that the names here should be released. *See Stern*, 737 F.2d at 84. This Court undertook a FOIA balancing in that

case under Exemption 7(C), which "places a greater emphasis on protecting personal privacy than does Exemption 6." *Id*. at 91. Under that higher standard, this Court ordered release of the name of a "Special Agent in Charge," *id*., an agent who did not serve in the leadership of the FBI or otherwise set or direct policy. And even while declining to order release as to two further "lower-level" employees, it called the question "close" under the heightened standard imposed by Exemption 7(C). *Id*. The *Stern* Court also resolved its balancing analysis there in significant part on possible association of the individuals in question "with alleged criminal activity," calling "a strong interest in not being associated" with such criminal activity "essential to our analysis here." *Id*. at 91-92. It specifically discussed the possible stigma and "serious damage to their reputations" of being associated with criminal activity. *Id*. at 92. And relatedly, the Court also gave serious consideration to the lack of intentionality on the part of the lower-level agents. It called them "culpable for inadvertence," noted that their "inadvertent failures to pursue leads and become sufficiently familiar with pre-existing records" involved "no element of intentional deception" on their part, and ultimately observed that "the public interest in knowing the identities of employees who became entwined inadvertently in [alleged wrongdoing] is not as great." *Id*. at 92-93. Even then, the Court again called the case "a close one" and hinged its decision that the FBI could withhold the two lowest-level names upon the likelihood that "the release of the names of

the two censured employees could cause them to become associated with notorious criminal investigations, where those employees were found to have contributed only inadvertently to the wrongdoing under investigation, and where the public interest in their identities is grounded only in a general notion of public servant accountability." *Id*. at 93.

*Stern* counsels release here, because of the many differences between those facts and the facts in this case. First, here, the employees at issue include a sergeant and two detectives—those employees look far more like the special agent in charge in *Stern*, as to whom the Court ordered release even despite the other discussed concerns about association with alleged criminal wrongdoing and resulting reputational damage. Second, compared to the *Stern* analysis as to even the lower-level employees there, the officers in question here would not risk association with criminal wrongdoing if their names were released. And third, what release *would* associate them with—incidents of excessive force against civilians in and around the District of Columbia—were intentional acts on their part, rather than inadvertent omissions as to which the public has less claim. Finally, even beyond the fact differences, this Court is undertaking the analysis under the lower Exemption 6 standard. Despite all of the foregoing facts in *Stern*, the Court still repeatedly called release of the officer names a "close" question under the higher standard, *id*. at 91, 93; the significant factual differences and the lower Exemption 6

standard should compel release even as to the lowest-ranked officers at issue in this case.

### E. Regardless, the District Court erred because the Government did not cite individualized reasons for withholding different officers' names.

*Stern* also highlights one separate error that the District Court made here at the invitation of the Government. The *Stern* Court distinguished between even otherwise very similarly-situated law enforcement officers in the same operation based upon different gradations in rank. It explained that "the level of responsibility held by a federal employee, as well as the activity for which such an employee has been censured, are appropriate considerations for determining the extent of the public's interest in knowing the identity of that censured employee" *Id*. at 92. Under the circumstances here, where both the Government and the District Court treated the officers as a monolith and did not unpack the differences in rank/title or other factual distinctions, its analysis amounts to error regardless of the result.

This Court has given repeated guidance not to make categorical rules without a very narrowly-defined category. "[A] categorical rule forbidding disclosure of the names of lower-level FBI agents in all activities is invalid. The privacy interest at stake may vary depending on the context in which it is asserted." *Armstrong*, 97 F.3d at 581-82. Indeed, even categorical rules involving people of the same rank may not stand in the

face of other differences. *See AILA*, 830 F.3d at 670 (rejecting a category of immigration judges and observing that "the government's across-the-board approach cannot be sustained in light of the variety of privacy and public interests that may be at stake in connection with the disclosure of an immigration judge's name."). Other differences besides rank matter too. In *AILA*, this Court noted several, including "whether a sitting immigration judge or someone no longer on the bench, whether a judge who has faced only one complaint or a judge who has repeatedly been the target of complaints, and whether the judge has been subjected to some type of discipline or has avoided disciplinary action (and the reasons why)." *Id.* at 675 (citing *Reporters Comm.*, 489 U.S. at 773). That Court also looked to "variety in types of complaints and circumstances of individual immigration judges." *Id.*

The Court's rejection of a categorical analysis even as to immigration judges of the same rank reflects the error in treating all the officers here similarly. The officers here differ in several ways. For one thing, they have different ranks or title—one is a sergeant; incidents two and three involve one or two detective(s). For another, they engaged in misconduct that led to settlements of different sizes—a reasonable proxy, especially absent other evidence, that their misconduct might have varied in severity. Third, they engaged in misconduct alternately at a national monument, in connection with a home raid, and in the context of a public meeting—three very different sorts of contexts. Fourth, the Park Police

specified that two of the three remain employed with the Park Police while leaving the employment status of the first one unmentioned. *See* Doc. 23-8 at 14, 15, 16. While the Court should presume that the first one remains employed for purposes of assessing the public interest on this posture, *see* Section I.C., *supra*, the distinction in treatment remains. Fifth, at least one of the individual officers had a misconducting finding substantiated by internal affairs. *See* Doc. 24-1. To be clear: the Government's uniform failure across all three officers to assert any potential harm from release or to make out a more than *de minimis* privacy interest obviates any need to remand for the District Court to conduct individual analysis. But if this Court thinks the Government's showing of harm was sufficient, and that the privacy interest of the officers was substantial, the District Court's failure to consider any of these distinctions for purposes of the Exemption 6 balancing would itself amount to error.

## II. The District Court invented a remedy for inadvertent release that has no basis in the text of the FOIA and cannot flow from the Court's implied powers.

Once the Government inadvertently disclosed some responsive records, the FOIA does not provide for any remedy for the Government to recover them. As the District Court acknowledged, its decision to order claw back for the Government has no basis in the text of the Act. *See* Doc. 31 at 11 ("FOIA does not provide for the compelled return or destruction

of inadvertently produced documents. *See generally* 5 U.S.C. § 552.") In ordering claw back anyway, the District Court relied upon "certain implied powers" through which the courts "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* But that purported basis depends upon a wrongful conflation of the FOIA statute and rules governing civil discovery and litigation management. The differences between disclosure under the FOIA and production pursuant to civil discovery underscore that claw back does not—and cannot—apply in the context of FOIA. Moreover, while some district courts have purported to order claw back in other cases, those cases not only lack support in the statute, but all at least involve other important considerations—such as national security—that do not apply here. Regardless of whether the disclosed information could have been withheld under some exemption, this Court should confirm that once disclosed under the FOIA, responsive information cannot be clawed back by the Government.

A. **Disclosure under the FOIA and production pursuant to civil discovery rules are not comparable, and the difference forecloses the District Court's resort to so-called implied powers here.**

In granting claw back to the Government, the District Court relied upon purported "implied powers" that let courts "manage their own affairs." Doc. 31 at 11. But "a judicial claim to an 'inherent power' is not

to be indulged lightly, lest it excuse overreaching 'the judicial power' actually granted to the federal courts by Article III of the Constitution." *Cobell v. Norton*, 334 F.3d 1128, 1141 (D.C. Cir. 2003). Indeed, any claim to so-called "implied powers" of the federal judiciary "must either be documented by historical practice," *id.* (citing *Miner v. Atlass*, 363 U.S. 641, 643-44 (1960)), or must be necessary to ensure that a court can still exercise its undoubted judicial authority. *Cobell*, 334 F.3d at 1141 (citing *Chambers v. NASCO*, 501 U.S. 32, 43 (1991)); *see also Chambers*, 501 U.S. at 43 (noting that "certain implied powers" exist, but only to the extent that "they are necessary to the exercise of all others"). The District Court's decision justifing its resort to amorphous "implied powers" does not even attempt to show either of those things. Nor could it. For the former, other than a handful of recent district court decisions, there is no historical practice of FOIA claw back. For the latter, claw back was not necessary to ensure the Court could decide the questions before it. And while implied powers may—although do not always—justify trial court orders managing discovery, disclosure under the FOIA differs in important ways from production pursuant to discovery. Moreover, the FOIA differs from civil discovery in the extent to which claw back orders implicate the First Amendment interests of requesters like Appellant. And given the difference, implied powers have no application in this context.

First, so-called "implied powers" may justify, at most, court interventions to ensure the integrity of their own judicial proceedings. *See Cobell*, 334 F.3d at 1141. Even then, implied powers are "limited by the necessity giving rise to [their] exercise," and must be "a reasonable response to the problem and needs that provoke" that exercise. *Degen v. United States*, 517 U.S. 820, 823-24 (1996). The Supreme Court has held any exercise of implied powers in this context must be consistent with the FOIA. *See Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 19 (1974). And under the FOIA, courts have the "responsibility of ensuring the fullest responsible disclosure." *Long v. United States I.R.S.*, 693 F.2d 907, 909 (9th Cir. 1982) (citing *Bannercraft*, 415 U.S. at 19). In that context, the FOIA is inconsistent with purported exercise of implied powers to authorize claw back, because FOIA "does not specifically provide for the return or destruction of inadvertently produced documents." *Sierra Club v. United States Environmental Protection Agency*, 505 F.Supp.3d 982, 988 (N.D. Cal. 2020). To the contrary, courts that have discussed and applied equitable powers—including injunctive relief—in the FOIA context have done so not against requesters, but against recalcitrant agencies. *E.g. Long*, 693 F.2d at 909. And this Court has also observed that because a document disclosed under FOIA "must be made available to the public as a whole," and "there is no opportunity to obtain a protective order," the "stakes of disclosure are greater in the FOIA context." *Stonehill v. I.R.S*, 558 F.3d 534, 539-40 (D.C. Cir. 2009).

But the heightened stakes are for the agency to manage, *see* Section II.B., *infra*, not justification for courts to invent a remedy out of implied powers that goes far beyond the limited proceedings directly before the court.

To the contrary, courts' implied powers to manage the proceedings in front of them can rarely if ever justify claw back, because inadvertent disclosure does not implicate the integrity of judicial proceedings. For one thing, the Government may always voluntarily disclose documents in response to a request that it could otherwise successfully assert an exemption to withhold—and any disclosed information under FOIA "lose[s] [its] protective cloak." *Cottone v. Reno*, 193 F.3d 550, 553-54 (D.C. Cir. 1999); *see also Citizens for Responsibility & Ethics in Wash. v. United States Dep't of Justice* ("*CREW II*"), 58 F.4th 1255, 1271 (D.C. Cir. 2023) (same, discussing the public-domain doctrine). Because the Government may always disclose any responsive document, inadvertent disclosure does not actually implicate the ability of a court to resolve the application of a FOIA exemption to particular documents in front of it, or indeed, the ability of a court to "see all questions directly raised under FOIA in this action—what documents the [Government] *must* produce—through to a just resolution." *Sierra Club*, 505 F.Supp.3d at 991.

Second, inadvertent disclosure does not implicate a court's need to manage proceedings because "the FOIA disclosure regime is distinct from civil discovery." *Chiquita Brands Int'l Inc. v. Sec. & Exch. Comm'n*, 805 F.3d 289, 300 (D.C. Cir. 2015); *see also Stonehill*, 558 F.3d at 538 (citing

*NLRB v. Sears, Roebuck Co.*, 421 U.S. 132, 144 (1975)) ("[t]he FOIA disclosure regime, however, is distinct from civil discovery"). For one thing, the FOIA, unlike civil discovery, does not "permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant" seeking the same information through discovery. *EPA v. Mink*, 410 U.S. 73, 86 (1973); *see also Stonehill*, 558 F.3d at 538 (discussing discovery analysis into relevance, need, and applicable privileges). For another thing, "factors that are relevant in discovery actions can be irrelevant under FOIA and vice-versa," *Washington Post Co.*, 690 F.2d at 259, and as a result, a document being "exempt from discovery does not necessarily mean that it will be exempt from disclosure under FOIA." *Stonehill*, 558 F.3d at 538 (citing *North v. Walsh*, 881 F.2d 1088, 1095 (D.C. Cir. 1989)). This distinction in factors and analysis includes, for example, individual privacy interests—relevant in an Exemption 6 analysis and not in discovery—or the availability of information from other sources—which lessens the case for discovery but bolsters the case for disclosure. *Stonehill*, 558 F.3d at 538. Perhaps most importantly, information disclosed under FOIA is disclosed "to the general public," unlike civil discovery—where protective orders make more sense because parties must produce information only to opposing litigants, *id.*, and where parties have an affirmative obligation to return certain inadvertently

produced but privileged documents. *See* Fed. R. Civ. P. 26(b)(5); ABA Model Rule 4.4(b).

And indeed, the distinction between FOIA disclosure and civil discovery production is starker in the context of FOIA Exemption 6 than in the context of other exemptions. As this Court has explained, "neither the text nor the legislative history of FOIA suggests that the existence of a discovery privilege should control the determination of whether withholding is warranted under Exemption 6." *Washington Post Co.*, 690 F.2d at 258. By contrast, other Exemptions incorporate or otherwise reference discovery privileges. Exemption 4, for example, "exempts 'commercial or financial information obtained from a party and *privileged* or confidential.'" *Id.* (quoting 5 U.S.C. § 552(b)(4) and adding emphasis). Exemption 6 also contrasts with, for example, Exemption 5, which permits withholding of otherwise responsive documents if the requesting party could not obtain them "in litigation with the agency," *Washington Post Co.*, 690 F.2d at 258 (quoting 5 U.S.C. § 552(b)(5)), and which "incorporates the privileges the government typically enjoys in pretrial discovery." *Stonehill*, 558 F.3d at 539 (internal citations omitted). So, while Appellant does not believe that claw back is ever an appropriate remedy for inadvertent disclosures under the FOIA, it is especially inappropriate when applied to information inadvertently disclosed as to which the Government asserts only Exemption 6 to purport to claw it back.

Third, beyond the mechanical differences, disclosure under the FOIA also implicates the First Amendment in a way that district court management of civil discovery does not. This owes partly to one of the aforementioned distinctions between FOIA disclosure and civil discovery: that "information disclosed during discovery is limited to the parties and can be subject to protective orders against further disclosure," while information disclosed under FOIA is "disclosed to the general public and the identity of the requester is irrelevant." *Stonehill*, 558 F.3d at 538-39. FOIA disclosure, by placing no limits on the subsequent use of the information, creates a corresponding First Amendment problem when a court purports to order claw back.

Despite this, the District Court here did not address that issue at all. In fairness, of the few district court cases purporting to allow claw back of inadvertently disclosed records, even fewer address First Amendment concerns—a significant shortcoming in the cases that purport to allow claw back. *Sierra Club*, 505 F.Supp.3d at 988 ("As far as this Court is aware, *ACLU* [*v. Dep't of Defense* ("*ACLU v. DOD*"), 664 F.Supp.2d 72 (D.D.C. 2009)] is the only FOIA clawback case to address First Amendment concerns"). And *ACLU v. DOD* undertook a cursory First Amendment analysis that has little bearing upon this (or nearly any other) claw back analysis, because the *ACLU v. DOD* Court's determination that the requesters did not have a First Amendment interest in the records at issue depended upon those documents being

classified. *See ACLU v. DOD*, 664 F.Supp.2d at 79 (observing that "there is obviously no First Amendment Right to receive classified information"); *see also* Section II.B., *infra*. For courts engaging with the serious First Amendment concerns with claw back, the Supreme Court has long held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *The Florida Star v. B.J.F.*, 491 U.S. 524, 533-34 (1989) (quoting *Smith v. Daily Mail*, 443 U.S. 97, 103 (1979)). And regardless of the state interest here—though whatever interest exists is hardly of the highest order—it matters conversely that the information at stake "concerned a matter of public significance." *Florida Star*, 491 U.S. at 536. For First Amendment purposes, that heightens the risk that a claw back order will violate longstanding rights.

Given the First Amendment interests at stake, it's worth considering not only the magnitude of the Government's request, but also the reason it must make that request here. As *Florida Star* reminds the Government, it has all the tools in the world to serve its interests here without any need to resort to seeking claw back:

> To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the

government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

491 U.S. at 534. Through that lens, claw back is especially unjustified. The Government has not suggested that claimants' names are classified information. The Government has established procedures for ensuring redacted release—that is, the FOIA—that specifically allow the Government to disclose responsive information even when it could invoke an exemption. And the Government can make no argument that receiving inadvertent FOIA disclosures here is "unlawful." Indeed, the Government *continues* to disclose the name of one of the two claimant subjects of the claw back order, because its own filing placed that claimant's name on the public docket of this case in the District Court and the Government has never once sought to correct that. *See* Doc. 23-8 at 14. Appellant takes no position on the likelihood of success that the individual subjects of the inadvertent disclosure might have on a claim against the Government, although it suspects that the Government would insist that they have no *Bivens* remedy or viable tort claim. But under the circumstances—where the error is the Government's, and where it has not done all that it can to protect against that error—the District Court erred by ordering claw back.

## B. Other district court decisions purporting to allow claw back are wrong, and in any event differ markedly from the facts here.

In ordering claw back here, the District Court cited two other district court decisions purporting to allow for claw back in cases involving inadvertent FOIA disclosures by the Government. Those cases are wrong; other district court decisions rejecting claw back have the better analysis. The very existence of cases ordering claw back underscores the need for this Court to reject a type of order that has no basis in statute or historical practice. But even if the cases the District Court cited here were correct on their particular facts, important distinctions between those cases and the facts here would counsel against claw back in this case regardless. For one thing, this case has nothing to do with national security. For another thing, the District Court here purported to order permanent claw back, rather than imposing a temporary limitation on what a party could do with inadvertently disclosed documents. Third, the claw back here involves the Government asking for claw back after its own inadvertent disclosure, rather than an intervenor asking for claw back to protect interests that it had not compromised of its own accord. And finally, although Appellant need not show this, the information at issue does not involve serious, foreseeable, non-speculative harms if released.

First, the district court decisions cited by the District Court in its claw back analysis are wrong. They make the same mistake the District Court made here—they treat disclosure under the FOIA as similar to civil discovery. One of the decisions cited by the District Court at least obliquely acknowledged the difference, noting that it situated its authority to enter a protective order "not . . . pursuant to Fed. R. Civ. P. 26," but rather in "powers vested upon it that are not derived from any statute or rule." *Public Citizen Health Research Grp. v. Food & Drug Administration*, 953 F.Supp. 400, 404 (D.D.C. 1996). Still, it explained that it exercised those powers to "balanc[e] the scales and protect[] its judicial proceedings," *id.*, akin to discovery management. For all the reasons noted in Section II.A., courts that make that conflation, and any claw back orders that result from that conflation, are wrong.

Second, however, regardless of the correctness of those decisions, they have several distinctions that in any event make them inapposite to the facts of this case such that their analyses do not support the District Court's claw back order—an order that is notable outlier even compared to those decisions.

One key distinction is that the information the District Court allowed the Government to claw back in this case has nothing to do with national security. Claw back in one case cited by the *Public Citizen* Court, *Am. Civil Liberties Union v. Dep't of Defense* ("*ACLU v. DOD II*"), No. 09-cv-8071, 2012 WL 13075284 (S.D.N.Y. Mar. 20, 2012), involved an

47

inadvertent disclosure of information bearing upon national security—classified documents about military detainees—that the Government had credibly asserted "could reasonably be expected to harm national security." *ACLU v. DOD II*, 2012 WL 13075284 at *1, *3, *5; *see also ACLU v. DOD*, 664 F.Supp.2d at 75 (discussing national security). Courts have long acknowledged—unfair as it is for requesters—that the Government concerns in that realm affect availability of information for release under the FOIA. This Court has previously explained, for example, that courts "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *Wolf*, 473 F.3d at 374-75 (citing *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984), and maintaining emphasis in underlying original); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993) (noting deference to expertise of agencies engaged in national security and foreign policy). And even district courts purporting to allow claw back of national security documents—including the other non-binding case upon which the District Court here relied—characterize as "significant" the "scope of harm that could result if classified information impacting the national security was made public." *Wilson Cowan v. Fed. Commc'n Comm'n*, 21-cv-895-RMM, 2022 WL 4245485 at *32 (D.D.C. Sep. 15, 2022) (discussing *ACLU v. DOD II*). No such interest bears upon the records at issue in this case.

Another key distinction from even the non-binding cited authority is that the District Court here purported to authorize permanent claw back. One cited case, by contrast, noted that the court's order applied only "until [the court] determines whether [the information] qualifies for non-disclosure pursuant to exemption four of FOIA." *Public Citizen*, 953 F.Supp. at 404. The limited duration of the order, that Court surmised, "will not infringe on any First Amendment concern," because "the order is only temporary in nature." *Id.* at 405 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 26 (1984)). *Wilson Cowan* cited both *Public Citizen* and two other district court cases involving claw back, and characterized all three as purporting to rely on inherent powers "to bar parties from disseminating information inadvertently disclosed in FOIA proceedings, at least temporarily." *Wilson Cowan*, 21-cv-895-RMM at *30 (D.D.C. Sep. 15, 2022); *see also id.* at *30-31 (noting that "courts may appropriately issue *temporary* protective orders controlling mistakenly disclosed information" (emphasis in original)). To the extent that claw back ordered on the basis of a court's "implied powers" must link to litigation management, temporary claw back that gives the Court and litigants time to brief and argue a better solution in the context of that litigation might make at least some sense—although Appellant would not concede so even then. But here, the District Court ordered permanent claw back with no reference to any temporal limitations on the exercise of implied powers.

The third important distinction is that here, the Government demanded claw back after its own inadvertent disclosure. One case cited by the District Court here ordered claw back not for the Government, but for an Intervenor, after noting specifically that it did so because "Defendant-Intervenors in the case currently before the court did not disclose [the information] to [the requester]; the government did." *Public Citizen*, 953 F.Supp. at 404-05. It treated this as nearly dispositive, calling other cases denying such claw back requests as "qualitatively different than the situation in this case where the government inadvertently inserted Defendant-Intervenors' information into the public domain." *Id.* (emphasis removed). This tracks with other cases denying claw back and general civil litigation practice—simply put, "[m]any mistakes by litigants have consequences." *Sierra Club*, 505 F.Supp.3d at 991 (denying claw back). Or, as the Supreme Court has observed, when "the government has failed to police itself in disseminating information," whatever next steps it takes should not involve coming after the recipients of inadvertent disclosure. *Florida Star*, 491 U.S. at 538.

The final important distinction is that the records the Government seeks to claw back here simply do not amount to sensitive records that would impose substantial, non-speculative harms upon anyone in the event of release. One case that allowed claw back involved, for example, "inadvertently produced documents that contained Social Security

numbers for individual FEMA employees." *Sierra Club*, 505 F.Supp.3d at 990 (citing and describing *Kielty v. Fed. Emergency Mgmt. Agency*, No. 14-CV-3269 (D.N.J. Dec. 8, 2014)). Social security numbers of the sort at issue in *Kielty*, linked as they are to people's financial lives and the release of which can directly cause identity theft, involve "serious and non-speculative harms," *Sierra Club*, 505 F.Supp.3d at 991, that many other sorts of records simply do not pose. Indeed, potential release of the bare names of federal tort claimants does not pose such harms themselves—nor has the Government seriously asserted that it does. And, contrary to the Government having offered, for example, a "pledge of confidentiality" to the tort claimants that might have "heightened" their "expectations of privacy," *Washington Post Co.*, 690 F.2d at 263, the names of tort claimants against the Park Police belong to people who willingly made claims under their name, including one here on a public docket. And "release of information provided under a pledge of confidentiality involves a greater invasion of privacy than release of information provided without such a pledge," including a name provided by filing a tort claim in anticipation of filing a federal lawsuit, or subsequently filing the lawsuit itself. *Id*. Even then, it would not justify claw back—but in its absence, the District Court's error in ordering claw back is starker.

# CONCLUSION

For all of the foregoing reasons, the judgment of the District Court should be reversed. This Court should reverse the District Court and order that Appellant is entitled to the names of the officers involved in excessive force incidents giving rise to federal tort claims against the Park Police; and it should vacate the District Court's order to the extent that it allows the United States to claw back inadvertent disclosure of some claimants' names.

Respectfully submitted,

/s/ Jim Davy

Deborah M. Golden
D.C. Bar # 470-578
THE LAW OFFICE OF
   DEBORAH M. GOLDEN
700 Pennsylvania Ave. SE
Second Floor
Washington, DC 20003
(202) 630-0332
dgolden@debgoldenlaw.com

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for Appellant*

Feb 28, 2024

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,347 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.66.1, set in Century Schoolbook 14-point type.

<u>/s/ Jim Davy</u>

Jim Davy

## CERTIFICATE OF SERVICE

I certify that on Feb. 28, 2023 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

I further certify that within the required time I will serve one (1) paper copy upon the Clerk of Court. Upon the filing of the deferred appendix, I will serve eight (8) copies of the updated brief upon the Clerk of Court. Those copies will be identical and unmodified to this one, except for added record citations.

<u>/s/ Jim Davy</u>

Jim Davy