NOT YET SCHEDULED FOR ORAL ARGUMENT
**No. 23-5236**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

HUMAN RIGHTS DEFENSE CENTER,

*Plaintiff – Appellant*

v.

UNITED STATES PARK POLICE

*Defendant – Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (Case No. 19-cv-1502)

**BRIEF OF *AMICUS CURIAE* NATIONAL POLICE ACCOUNTABILITY
PROJECT IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

Keisha James
PO Box 56386
Washington, DC 20040
keisha.npap@nlg.org
(202) 557-9791

Lauren Bonds
Eliana Machefsky
National Police Accountability Project
1403 Southwest Boulevard
Kansas City, Kansas 66103
legal.npap@nlg.org
fellow.npap@nlg.org

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel for *amicus curiae* National Police Accountability Project certifies the following:

### A. Parties and *Amici*

Plaintiff-Appellant is the Human Rights Defense Center. Defendant-Appellee is the United States Park Police. *Amicus Curiae* is the National Police Accountability Project ("NPAP"), a nonprofit organization. The only other *amici curiae* known to NPAP are the Americans for Prosperity Foundation and the Reporters Committee for Freedom of the Press, along with the 27 news media corporations that joined the Reporters Committee's *amicus* brief.

### B. Rulings Under Review

Under review is the district court's memorandum opinion and order on the parties' cross-motions for summary judgment in *Human Rights Defense Center v. U.S. Park Police*, No. 19-cv-1502-TSC, ECF Nos. 31 and 32 (D.D.C. Aug. 29, 2023), in which the district court concluded that Exemption 6 of the Freedom of Information Act permitted the United States Park Police to withhold the information requested by the Human Rights Defense Center.

### C. Related Cases

This case has not previously been before this Court, and *amicus curiae* is unaware of any related cases pending in this or any other court.

/s/ Keisha James
Keisha James
Counsel for *Amicus Curiae*

## CERTIFICATE UNDER CIRCUIT RULE 29(D)

Pursuant to Circuit Rule 29(d), the undersigned counsel for *amicus curiae* National Police Accountability Project ("NPAP") certifies that NPAP's *amicus* brief is necessary because it provides the Court with a particular perspective that the parties and other *amici* cannot: insight into the varied and profound public benefits of transparency in police misconduct records.

NPAP is a nonprofit organization committed to protecting the human and civil rights of individuals in their encounters with law enforcement and detention facility personnel. NPAP aims to promote the accountability of law enforcement officers and their employers for violations of the Constitution and the laws of the United States. To that end, NPAP pursues litigation and advocacy efforts to increase transparency and accountability in policing. NPAP's attorney members request and rely upon state public records requests and Freedom of Information Act ("FOIA") requests as a part of their civil rights litigation practices.

/s/ Keisha James
Keisha James
Counsel for *Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the undersigned counsel for *amicus curiae* respectfully submits the National Police Accountability Project is a non-profit organization. It has no parent corporation, and no publicly held corporation owns ten percent or more of its stock because it has no stock. Amicus does not have a financial interest in the outcome of this litigation.

Plaintiff-Appellant Human Rights Defense Center and Defendant-Appellee United States Park Police consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2); Cir. R. 29(b).

/s/ Keisha James
Keisha James
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases .................................i

Certificate Under Circuit Rule 29(d).................................................... iii

Corporate Disclosure Statement...........................................................iv

Table of Authorities............................................................................vi

Interests of *Amicus Curiae* ...................................................................1

Summary of the Argument....................................................................2

Argument...........................................................................................4

I.      Hiding the Identities of the Officers in Question Hinders the Public's Ability to Hold the U.S. Park Police and its Officers Accountable to Constitutional and Professional Standards.........................................................................4

II.     Disclosing the Identities of Law Enforcement Officers Who Have Been Credibly Accused of Misconduct Mitigates Distrust Between Police and Communities. ........................................................................................9

III.    Identification of Officers with Histories of Repeated Misconduct Protects the Integrity of the Criminal Process....................................................12

IV.    Communities and Elected Officials Can Only Make Informed Policy and Budget Decisions if They Possess Knowledge About Law Enforcement Misconduct and Departmental Responses to it. ....................................................15

Conclusion.......................................................................................18

Certificate of Compliance ...................................................................19

Certificate of Service..........................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Human Rights Defense Center v. U.S. Park Police*, No. 19-cv-1502-TSC (D.D.C. Aug. 29, 2023) ................................................................................................. 7, 9

**Other Authorities**

Aimee Ortiz, *Confidence in Police is at a Record Low, Gallup Finds*, N.Y. Times (Aug. 12, 2020) ........................................................................................... 9

Aimee Ortiz, *Confidence in Police is at a Record Low, Gallup Finds*, THE N.Y. TIMES (Aug. 12, 2020) ....................................................................................... 9

Ben Grunwald and John Rappaport, *The Wandering Officer*, 129 YALE L.J. 1676 (2020) ............................................................................................................... 6, 8

*Citizens Police Data Project*, INVISIBLE INSTITUTE ................................................. 7

Cynthia Conti-Cook, *A New Balance: Weighing Harms of Hiding Police Misconduct Information from the Public*, 22 CUNY L. REV. 148 (2019) ...6, 10, 11, 12, 17

Jan Ransom, *In N.Y.C. Jail System, Guards Often Lie About Excessive Force*, THE N.Y. TIMES (Apr. 24, 2021) ....................................................................... 16

Katherine J. Bies, Note, *Let the Sunshine In: Illuminating the Powerful Role Police Unions Play in Shielding Officer Misconduct*, 28 STAN. L. & POL. REV. 109 (2017) ................................................................................................................. 4

Kim Barker and Serge F. Kovaleski, *Officer Who Pressed His Knee on George Floyd's Neck Drew Scrutiny Long Before*, N.Y. TIMES (Mar. 29, 2021) .............. 5, 9

Lee Kovarsky, *AEDPA's Wrecks: Comity, Finality, and Federalism*, 82 TULANE L. REV. 443 (2007) ........................................................................................... 15

Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, DISSENT (Fall 2017) ................................................................................................................... 8

President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing*, Office of Community Oriented Policing Services (May 2015) ....................................................................................... 10

Rachel Moran and Jessica Hodge, *Law Enforcement Perspectives on Public Access to Misconduct Records*, 42 CARDOZO L. REV. 1237 (2021) .....................................6

Robert Lewis & Noah Veltman, *The Hard Truth About Cops Who Lie*, WNYC NEWS (Oct. 13, 2015) ........................................................................................13, 14

Sarah Kaplan, *Chicago police officer charged in deadly shooting has a history of misconduct complaints*, THE WASHINGTON POST (Nov. 25, 2015) .......................5, 9

Sunita Patel, *Toward Democratic Police Reform: A Vision for "Community Engagement" Provisions in DOJ Consent Decrees*, 51 WAKE FOREST L. REV. 793 (2016) ...............................................................................................................11

*The Force Report*, NJ.COM: PROJECTS & INVESTIGATIONS...................................16

Thea Johnson, *Crisis and Coercive Pleas*, 110 J. CRIM. L. & CRIMINOLOGY ONLINE 1 (2020) ................................................................................................................13

Tom Jackman, *As prosecutors take larger role in reversing wrongful convictions, Philadelphia DA exonerates 10 men wrongfully imprisoned for murder*, THE WASHINGTON POST (Nov. 12, 2019) ......................................................................14

William H. Freivogel and Paul Wagman, *Wandering cops shuffle departments, abusing citizens*, ASSOCIATED PRESS (Apr. 28, 2021)..............................................6

## INTERESTS OF *AMICUS CURIAE*

The National Police Accountability Project ("NPAP") was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately six hundred attorney members practicing in every region of the United States, including several members in the District of Columbia, Maryland, and Virginia. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention.

NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients. Transparency is an essential prerequisite to accountability and attorneys who bring civil rights actions frequently rely on police disciplinary records obtained through public records requests to develop their client's case.

## SUMMARY OF THE ARGUMENT

A law enforcement officer's history of misconduct raises profound questions about that officer's suitability to wield state-sanctioned deadly force or deprive members of the public of their liberty. It also raises critical questions about the rigor with which the officer's employing police department investigates, corrects, and prevents future instances of misconduct. This case need not resolve those profound questions, however. It must merely affirm that the public itself should have the basic information sufficient to consider and discuss those questions out in the open.

This Court should also consider the harmful long-term effects of shielding the identity of officers who are credibly accused of wielding excessive force and arresting civilians without probable cause. First, substantial evidence demonstrates that public trust in law enforcement has deteriorated over time, and that lack of trust inhibits law enforcement's ability to fulfill its investigatory functions and promote justice. Declining to require disclosure here—preventing the public from learning the identities of the officers in question—would further erode that trust. When calls go out to members of the public to report criminal offenses, serve as witnesses, or otherwise work with police, evidence shows that the public will think twice before agreeing—understandably wondering whether the officers seeking

their collaboration, and the departments employing them, have their best interests at heart.

Second, information about officers accused of serious misconduct matters because it goes to the heart of the integrity of the criminal legal system. When officers swear out warrants, claim probable cause, and testify in criminal trials, the entire legal system depends on their credibility, and on attorneys protecting the rights of defendants through investigation, suppression, cross-examination, and other means. Protecting the identities of officers credibly accused of serious misconduct strikes at the integrity of the criminal legal system in the present and future and prevents advocates from correcting past injustices.

Finally, shielding information about officer misconduct also undercuts budget and reform conversations, which can only be had from an informed posture if communities, elected officials, and stakeholders have full knowledge of what—and whom—dollars spent on policing ultimately fund. In particular, the resources expended to investigate, defend against, and settle claims of misconduct implicate policy questions about how to reduce complaints in the future. This is true regardless of one's normative position on police funding.

*Amicus Curiae* urges this Court to reverse the district court's decision below and to order the disclosure of the U.S. Park Police ("USPP") officers' identities to Plaintiff-Appellant Human Rights Defense Center ("HRDC").

**ARGUMENT**

## I. Hiding the Identities of the Officers in Question Hinders the Public's Ability to Hold the U.S. Park Police and its Officers Accountable to Constitutional and Professional Standards.

Members of the public have the right to know whether the law enforcement officers charged with policing them are well-suited for the job. Police officers possess immense and unique authority—to interrogate, detain, and arrest community members, and to carry weapons with which they can threaten or end an individual's life. *See* Katherine J. Bies, Note, *Let the Sunshine In: Illuminating the Powerful Role Police Unions Play in Shielding Officer Misconduct*, 28 STAN. L. & POL. REV. 109, 142 (2017) ("police officers have the unique state-sanctioned ability to use force on other citizens"). The public may well determine that an officer who repeatedly abuses this authority is no longer worthy of wielding it. But when a police department shields the identities of its officers who have been credibly accused of abusing their authority, as the USPP has done here, it is impossible for the public to determine whether those officers have even received complaints or discipline for similar misconduct in the past.

Hiding the identities of officers accused of misconduct also prevents the public from evaluating whether the employing police agency has adequately investigated and, if appropriate, disciplined, its officers. For instance, the presence of multiple unsubstantiated civilian complaints in an officer's file should prompt a

closer look at the department's investigatory procedures. Such a file may very well be what the department presents it to be—the product of litigious civilians with frivolous allegations. But, as demonstrated by the cases of former police officers Derek Chauvin[1] and Jason Van Dyke,[2] to name just two high-profile examples, these files more likely reflect perfunctory or otherwise inadequate internal affairs investigations and lackluster disciplinary practices. Chauvin's and Van Dyke's extensive records of civilian complaints suggest concerning patterns of excessive force, which, when left inadequately investigated and disciplined, ultimately—and predictably—enabled each officer to take a civilian's life.

Transparency of the records Appellant seeks also benefits law enforcement itself. Cities and towns throughout the country often unwittingly hire officers with concerning backgrounds who they otherwise would have rejected because they

---

[1] In the 19 years before Chauvin murdered George Floyd during an arrest, he was the subject of at least 22 civilian complaints or internal investigations, only one of which resulted in him being disciplined. Kim Barker and Serge F. Kovaleski, *Officer Who Pressed His Knee on George Floyd's Neck Drew Scrutiny Long Before*, N.Y. TIMES (Mar. 29, 2021), https://www.nytimes.com/2020/07/18/us/derek-chauvin-george-floyd.html.

[2] During the 14 years Van Dyke served on the force before shooting 17-year-old Laquan McDonald to death, he had been named in at least 18 civilian complaints, most alleging excessive force, none of which resulted in any disciplinary action. Sarah Kaplan, *Chicago police officer charged in deadly shooting has a history of misconduct complaints*, THE WASHINGTON POST (Nov. 25, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/11/25/chicago-cop-charged-in-deadly-shooting-has-a-history-of-misconduct-complaints/.

were not aware of the officers' prior misconduct. *See, e.g.*, Ben Grunwald and John Rappaport, *The Wandering Officer*, 129 YALE L.J. 1676, 1680-1684 (2020) (collecting examples); William H. Freivogel and Paul Wagman, *Wandering cops shuffle departments, abusing citizens*, ASSOCIATED PRESS (Apr. 28, 2021)[3] (describing flaws in the National Decertification Index that impede its ability to prevent repeat-offender officers from seeking new law enforcement employment, including the fact that "names in the database are not public"); Rachel Moran and Jessica Hodge, *Law Enforcement Perspectives on Public Access to Misconduct Records*, 42 CARDOZO L. REV. 1237, 1271 (2021) (confidentiality in police misconduct records can enable dangerous police officers to find work at new departments without public knowledge, according to a police supervisor). Transparency about officers who have received multiple like complaints, whether they resulted in formal discipline or not, can reveal patterns of misconduct and spur corrective action by all stakeholders. *See* Cynthia Conti-Cook, *A New Balance: Weighing Harms of Hiding Police Misconduct Information from the Public*, 22 CUNY L. REV. 148, 159 (2019) ("many people do not engage with the governmental oversight systems because they cannot learn what penalty, if any, an officer receives"); see also id. at 166 (discussing officers' inability to compare own

---

[3] *Available at*: https://apnews.com/article/michael-brown-business-police-reform-death-of-george-floyd-bfd018e3c12413f840482efca29ca6ba.

discipline to other officers' discipline to assess discrimination or proportion). Preventing citizens from even learning these officers' names stymies those important functions and stops members of the public from identifying the systemic failure of officers to adhere to policy and formulating possible solutions. *See Citizens Police Data Project*, INVISIBLE INSTITUTE.[4]

The district court overlooked these manifold benefits of transparency in denying disclosure of the USPP officers' identities. Dismissing the settled allegations as unsubstantiated civilian complaints, the district court "acknowledge[d] that the allegations against the officers were never proven in a judicial proceeding" and concluded that "disclosing their names may lead the public to [improperly] infer that the officers engaged in wrongdoing, which could result in retaliation, embarrassment, harassment, and undue public attention." *Human Rights Defense Center v. U.S. Park Police*, No. 19-cv-1502-TSC (D.D.C. Aug. 29, 2023), ECF No. 31 at 9. It also determined that because "no allegations ha[d] been proven," the public interest in disclosure was *de minimis*. *Id*.

As a preliminary matter, civilian complaints that are both serious and credible enough to prompt monetary settlement may remain unproven as a strict matter of law, but they are far from spurious or otherwise unsubstantiated. Civil verdicts of liability are poor measures of actual misconduct, considering the

---

[4] *Available at*: https://perma.cc/HC4Z-JW3V.

various legal hurdles civil rights plaintiffs face, including qualified immunity, which regularly dispose of otherwise-meritorious claims before trial. *See, e.g.*, Lynn Adelman*, The Supreme Court's Quiet Assault on Civil Rights*, DISSENT (Fall 2017)[5] ("The Supreme Court's message to lower courts is clear: think twice before allowing a government official to be sued for violating an individual's constitutional rights. As a result, the lower federal courts are disposing of cases based on qualified immunity at an astonishing rate."). In this sense, settlement can actually serve as a rubric for *meritorious* police misconduct claims, because it indicates not only that the allegations survived the defense of qualified immunity, but also that they had sufficient factual basis to make prompt monetary payment an attractive alternative to a public trial for the accused officers and their employing departments.

More importantly, however, as the preceding discussion makes clear, public disclosure of even unsubstantiated civilian complaints is often necessary to expose systemic deficiencies in department screening, investigatory, and disciplinary practices. It can allow the public to identify officers who repeatedly engage in questionable or outright unlawful conduct, despite clean disciplinary records. *See, e.g.*, Grunwald and Rappaport, *The Wandering Officer*; Barker and Kovaleski,

---

[5] *Available at*: https://www.dissentmagazine.org/article/supreme-court-assault-civil-rights-section-1983/.

*Officer Who Pressed His Knee on George Floyd's Neck Drew Scrutiny Long Before*; Kaplan, *Chicago police officer charged in deadly shooting has a history of misconduct complaints*. The district court missed precisely this point when it distinguished the cases of Derek Chauvin and Jason Van Dyke from "the tort incidents at issue here, which did not result in fatalities." *Human Rights Defense Center*, No. 19-cv-1502-TSC, ECF No. 31 at 11. Chauvin's and Van Dyke's cases demonstrate the indispensability of public access to the identities of officers who have received multiple complaints of excessive force and other misconduct *before* their unchecked misconduct can spiral into unjustified lethal force. The public's strong interest in identifying recidivist police officers early enough to prevent "police-involved murders" among other harms, *id.*, urges the disclosures Appellant seeks here.

## II. Disclosing the Identities of Law Enforcement Officers Who Have Been Credibly Accused of Misconduct Mitigates Distrust Between Police and Communities.

Distrust between communities and law enforcement has substantially increased in recent years. *See* Aimee Ortiz, *Confidence in Police is at a Record Low, Gallup Finds*, THE N.Y. TIMES (Aug. 12, 2020) (finding in the first time in 27 years, the majority of American adults do not trust the police).[6] This is owed to

---

[6] *Available at*: https://www.nytimes.com/2020/08/12/us/gallup-poll-police.html.

numerous factors, including, but not limited to, increased availability of cell phone and body camera footage, high-profile incidents of law enforcement officers killing unarmed civilians, and the increasing propensity of officers to live outside of the communities in which they serve. *See, e.g.*, President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing*, Office of Community Oriented Policing Services (May 2015);[7] Cynthia Conti-Cook, *A New Balance: Weighing Harms of Hiding Police Misconduct Information from the Public*, 22 CUNY L. Rev. 148, 159 (2019) ("Many people avoid calling the police, even when in danger, wanting to avoid future encounters, especially after high-profile police violence."). But regardless of its origin, this distrust causes several problems for stakeholders across the criminal legal system. Among other effects, distrust inhibits law enforcement's ability to investigate and solve cases, heightens tension during ordinary interactions between community members and law enforcement, and generally undermines the ability of law enforcement to serve its ostensible function. *See* President's Task Force at 1 ("Decades of research and practice support the premise that people are more likely to obey the law when they

---

[7] *Available at*:
https://d3n8a8pro7vhmx.cloudfront.net/nacole/pages/115/attachments/original/1570474092/President-Barack-Obama-Task-Force-on-21st-Century-Policing-Final-Report-min.pdf?1570474092.

believe that those who are enforcing it have authority that is perceived as legitimate by those subject to the authority.").

Disclosure of the identities of the USPP officers in question would contribute to efforts to rebuild trust between law enforcement and communities. *See* President's Task Force at 1 ("Law enforcement agencies should also establish a culture of transparency and accountability to build public trust and legitimacy."). To be sure, disclosure in this one case cannot completely remedy a multi-faceted problem. But communities interacting with USPP officers will have more reason to trust individual officers if the USPP is transparent about which officers have received complaints both serious and credible enough to prompt them to settle with the complaining civilians. *See* Sunita Patel, *Toward Democratic Police Reform: A Vision for "Community Engagement" Provisions in DOJ Consent Decrees*, 51 WAKE FOREST L. REV. 793, 802 (2016) ("when police processes are perceived as procedurally just, communities are more likely to cooperate with the police, and policing, in turn, is more effective"); *Harms of Hiding*, 22 CUNY L. Rev. at 158 ("The deflections, delays, and denials of responsibility for police violence cause more unrest and distrust."). This is especially true where, as here, the detective(s) named in two of the three settled complaints is (or are) still employed with the USPP, and the employment status of the sergeant named in the third complaint remains unknown. Transparency here could also address one of the most

pernicious double-standards that engenders suspicion and mistrust in law enforcement: law enforcement regularly attempts to portray victims of police violence as imperfect or flawed, but often does not release any comparable information that exists about officers. *See Harms of Hiding*, 22 CUNY L. Rev. at 154-56.[8]

### III. Identification of Officers with Histories of Repeated Misconduct Protects the Integrity of the Criminal Process.

Disclosure of identifying information that allows the public to determine whether an officer has been the subject of multiple past complaints or disciplinary measures provides vital protection for the integrity of the criminal legal process. This information can help those facing charges focus their pre-trial investigation on misconduct that would justify evidence suppression or dismissal of their charges. For instance, if an arresting officer has received past complaints or discipline for conducting improper searches or arrests, as at least one USPP detective was accused of here, the defense attorney will know to look for similar inappropriate actions taken during their client's arrest.

---

[8] "Following any violent encounter, the power of releasing a person's history of violence is indisputable. The police know this; they often unlawfully and recklessly release the sealed arrest history of people police have killed. . . . As the police push their narrative of events, they almost never reveal an officer's history of violence."

Information about repeat-offender officers is particularly important for indigent defendants who cannot afford bond and experience far greater pressure to plead guilty while incarcerated pretrial. *See, e.g.*, Thea Johnson, *Crisis and Coercive Pleas*, 110 J. CRIM. L. & CRIMINOLOGY ONLINE 1 (2020).[9] Having clear information about officers during the pretrial investigatory and motions phase— prior to the plea—plays an especially important role in safeguarding the rights and liberties of indigent defendants.

For the criminal cases that do go to trial, revealing the identity of officers who have engaged in repeated misconduct would protect the integrity of proceedings by ensuring that officers testifying at criminal trials face appropriate cross-examination. Some law enforcement conduct (or misconduct) implicates officers' credibility, and depriving defense attorneys of that information about prior conduct hamstrings them in a way that compromises the integrity of the proceedings. *See* Robert Lewis & Noah Veltman, *The Hard Truth About Cops Who Lie*, WNYC NEWS (Oct. 13, 2015) (describing 2,700 arrests made by 54 officers *after* courts had deemed them non-credible).[10] The absence of transparency also

---

[9] *Available at*:
https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1000&context=jclc_online.

[10] *Available at*: https://www.wnyc.org/story/hard-truth-about-cops-who-lie/.

exacerbates inequities because it affects some defendants more than others. Defendants represented by more experienced or sophisticated attorneys may benefit from those attorneys' individual or institutional knowledge about a particular officer's record when developing witness cross-examination topics and material.

Finally, disclosure in this context would protect the integrity of the criminal legal system post-hoc. Many people are convicted and currently incarcerated because of the misconduct of officers, none of which ever emerged before or during their initial prosecutions. *See, e.g.*, Tom Jackman, *As prosecutors take larger role in reversing wrongful convictions, Philadelphia DA exonerates 10 men wrongfully imprisoned for murder*, THE WASHINGTON POST (Nov. 12, 2019). Transparency about officers who violated individual rights or department policies often signals to attorneys and other advocates to scrutinize past convictions that may have been tainted by investigatory or other misconduct. *See* Lewis and Veltman, *The Hard Truth About Cops Who Lie* ("The stakes couldn't be higher. When an officer distorts the truth . . . innocent people can go to prison.").

This interest belongs not only to wrongfully incarcerated individuals, but to the federal government, USPP, and the legal system itself. Disclosure of the USPP officers' identities would help protect the finality of convictions, a key government interest. *See, e.g.*, Lee Kovarsky, *AEDPA's Wrecks: Comity, Finality, and*

*Federalism*, 82 TULANE L. REV. 443 (2007). Earlier correction of pervasive misconduct will prevent the government from facing after-the-fact invalidation of convictions on the basis of misconduct that could have prevented.

IV.  **Communities and Elected Officials Can Only Make Informed Policy and Budget Decisions if They Possess Knowledge About Law Enforcement Misconduct and Departmental Responses to it.**

Beyond promoting trust and accountability that can improve the efficacy of policing and the integrity of the criminal legal system, transparency about police officer misconduct and departmental responses to it also has a vital role to play in our civic life and in government functioning—at the city, state, and federal levels alike. Robust civic deliberation about budgets and spending priorities relies on all stakeholders having informed perspectives on what public money funds. Elected officials and the people who vote for them need information about structural misconduct, policy violations, and officers' willingness to violate constitutional norms and rights because those abuses impact the public. Transparency helps the public understand what its money funds, including whether that money has been spent well under the circumstances. Taxpayer dollars fund defense costs, settlement awards, and paid leave for officers who engage in misconduct. Transparency could help the federal government make more informed decisions about public money, protecting taxpayers and ensuring that public funds are used responsibly.

What data does exist suggests that violations of individual rights by officers willing to ignore the Constitution end up costing jurisdictions across the country huge sums of money in civil rights lawsuits. But that information can be hard to come by, difficult to aggregate, and necessarily under-counts all law enforcement misconduct—often only coming out because of the dogged efforts of investigative journalists to collect and contextualize it. *See The Force Report*, NJ.COM: PROJECTS & INVESTIGATIONS (describing difficulty of assembling information on officer use of force, and contextualizing settlements or verdicts based on widely varying factors separate from the misconduct itself).[11] The NJ.com use of force report exists in no small part because of open public records laws, and reporters' pursuit of records through them.

The amount of money that the government spends on lawsuits defending one of its officers accused of misconduct undoubtedly bears on public discourse. Transparency of the identities of officers accused of misconduct and the manner in which USPP has disciplined—or declined to discipline—those officers might highlight both the cause and effect of misconduct on public budgets, and the shortcomings of relying on civil settlements or verdicts to track and deter misconduct in the first place. *See* Jan Ransom, *In N.Y.C. Jail System, Guards Often Lie About Excessive Force*, THE N.Y. TIMES (Apr. 24, 2021) (quoting a city

---

[11] *Available at*: https://perma.cc/U99S-A2MC.

councilman saying that discipline data "highlights how broken this process is and a need to make real efforts to reform it");[12] Cynthia Conti-Cook, *A New Balance: Weighing Harms of Hiding Police Misconduct Information from the Public*, 22 CUNY L. Rev. 148, 154 (2019) (discussing lack of transparency as depriving victims of law enforcement violence of key information in seeking redress).

To be clear, transparency of the USPP officers' identities would only be one small part of the information that must be considered in debates about police funding and public money. Transparency contributes to a more robust discourse about police funding overall, regardless of one's normative position. *See Fields*, 862 F.3d at 358 (observing that the "increase in the observation, recording, and sharing of police activity has contributed greatly to our national discussion of proper policing"). All told, transparency of the officers' identities, which in turn could reveal any pattern of past misconduct and the USPP's response to it, would provide vital information to stakeholders on all sides of civic discourse around law enforcement. In the absence of transparency, those same conversations take place—but among people whose best intentions cannot make up for the information void they face.

---

[12] *Available at*: https://www.nytimes.com/2021/04/24/nyregion/rikers-guards-lie-nyc-jails.html.

## CONCLUSION

The public has the right to know whether its police officers, who possess the power to detain and use force, have received multiple complaints of, or discipline for, misconduct that could render them unsuitable for the job. USPP seeks to block the public's access to this information by shielding the identities of its officers whose alleged misconduct prompted three separate settlements. Permitting such secrecy would impede crucial accountability efforts, accelerate the decline of community trust in law enforcement, and strike at the heart of a legal system that depends on officer credibility and respect for the rule of law. This Court should order disclosure in service of protecting individual rights.

Dated: March 6, 2024                  Respectfully Submitted,

/s/ Keisha James
Keisha James
PO Box 56386
Washington, DC 20040
keisha.npap@nlg.org
(202) 557-9791

Lauren Bonds
Eliana Machefsky
National Police Accountability Project
1403 Southwest Boulevard
Kansas City, Kansas 66103
legal.npap@nlg.org
fellow.npap@nlg.org

Counsel for *Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) and Circuit Rules 29(a)(5) and 32(a)(7) because it contains 3,710 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a)(5) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 6, 2024            /s/ Keisha James

Keisha James

Counsel for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that on March 6, 2024, this brief was filed using the Court's

CM/ECF system. All participants in the case are registered CM/ECF users and will

be served electronically via that system.


Dated: March 6, 2024                                 /s/ Keisha James
                                                     Keisha James

                                                     Counsel for *Amicus Curiae*